## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Carla Austin and Nil Leone, individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**Invention Submission Corp. d/b/a InventHelp, Western Invention Submission Corp. d/b/a Western InventHelp, Intromark Incorporated, and Technosystems Service Corporation,**<br><br>**Defendants.** | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Carla Austin and Nil Leone ("Plaintiffs") bring this class action lawsuit on behalf of themselves and all others similarly situated, against Defendants Invention Submission Corp. d/b/a InventHelp ("ISC"), Western Invention Submission Corp. d/b/a Western InventHelp ("WISC") (together, "InventHelp"), Intromark Incorporated, and Technosystems Service Corporation (collectively, "Defendants"), and allege as follows based on personal knowledge and investigation of counsel:

### INTRODUCTION

1.      Plaintiffs bring this Class Action on behalf of consumers who entered into InventHelp Submission Agreements with ISC or WISC for invention promotion services.

2.      This class action arises from InventHelp's material fraudulent statements, and omissions of fact regarding its standardized invention submission services and its failure to perform under the terms of its contracts with Plaintiffs and Class members.

3.      Plaintiffs assert claims against Defendants for violation of the American Inventor's Protection Act of 1999, 35 U.S.C. § 297 ("AIPA") and for breach of contract under Pennsylvania law, which applies to all Class members' contracts.

4.      InventHelp advertises that it is in the business of submitting to industry the new ideas, inventions or products ("inventions" or "products") of its inventor clients in exchange for a fee, to obtain a "good faith review" of inventions for the purpose of potential commercialization.

5.      InventHelp represented to Plaintiffs and Class members that it would submit their inventions to certain businesses listed in a claimed proprietary Data Bank of approximately 9,000 companies (the "Data Bank") that have both: (a) registered with InventHelp; and (b) agreed to review any inventions that InventHelp submits to them on a confidential basis. *See* Exhibit 1 (Submission Agreement between Carla Austin and Western InventHelp dated June 7, 2017) ("Austin Submission Agreement") and Exhibit 2 (Submission Agreement between InventHelp and Nil Leone dated September 10, 2018) ("Leone Submission Agreement") (together "Plaintiffs' Submission Agreements").

6.      ISC and WISC make little or no distinction between themselves. ISC performs the promised services under both ISC and WISC Submission Agreements. ISC maintains the Data Bank discussed below and purports to submit inventions to industry. Plaintiffs' Submission Agreements, whether they are with ISC or WISC, share the same title page that identifies the contract as an "InventHelp Agreement." Plaintiffs who signed contracts with ISC or WISC both received correspondence from InventHelp and received a "Company Submission Report" listing InventHelp "Data Bank" companies and sent on InventHelp letterhead. There is only one InventHelp website, InventHelp.com, for ISC and WISC. The WISC contract refers to its services as "InventHelp's standardized submission processes." Leone Submission Agreement, Preamble.

Unless otherwise stated, the term InventHelp refers equally to both ISC and WISC as their operations are integrated, both in practice and by contract.

7.     In reality, InventHelp's submission services are a costly scam that violate the AIPA and constitute a breach of customers' contracts' implied covenants of good faith and fair dealing.

8.     InventHelp aggressively advertises its services to hopeful inventors and then extracts exorbitant fees from them ranging from $8,900 to $16,900, in exchange for the provision of invention services which are purportedly two-fold. Specifically, InventHelp promises that: (a) it has specialized access to industry which it can leverage to get inventions to the right businesses that are interested in commercialization of customers' inventions or products; and (b) it has specialized and accurate means to select and match inventions to businesses.

9.     InventHelp's standardized submission services are deeply flawed, as it omits to disclose that it has no reasonable and systematic procedures in place to assure with accuracy that its Data Bank is not rife with defunct and non-operational companies and that InventHelp does not actually match its clients' inventions to companies most likely to be interested in a particular invention so as to yield optimum results.

10.    InventHelp's misrepresentations and omissions are material. Plaintiffs and Class members did not receive the benefits they reasonably expected, and InventHelp did not act in good faith to fulfill its obligations as set forth in its standard contracts which are uniformly governed by Pennsylvania law.

11.    Plaintiffs and Class members would not have contracted with InventHelp and paid many thousands of dollars for invention submission services had they known that InventHelp's services were illusory and that its Data Bank contained a large number of defunct and/or non-existent companies.

12.     InventHelp's misleading representations and omissions of material facts caused Plaintiffs and others similarly situated to suffer significant financial injury. Plaintiffs seek damages, rescission of their Submission Agreements, and restitution of the monies they paid to InventHelp.

## PARTIES

13.     Plaintiff Carla Austin, a resident of Vacaville, California, signed a Submission Agreement with Western InventHelp on June 7, 2017. Angela Beauchamp signed and accepted the Austin Submission Agreement on behalf of Western InventHelp on October 4, 2017. Ms. Austin agreed to pay $13,900 to Western InventHelp for its invention submission and matching services and also agreed to refrain from otherwise marketing her invention. *See* Austin Submission Agreement.

14.     In accordance with InventHelp's standardized practices, Ms. Austin also signed a contract at the same time with Intromark Incorporated, a Western InventHelp affiliate and contractual partner that assists inventors to market their inventions, promising to attempt to obtain a sale or licensing agreement when InventHelp's submission to industry has elicited "substantial interest." *See* Exhibit 3 (Intromark Proposal dated June 7, 2017 between Ms. Austin and Intromark Incorporated and signed by Angela Beauchamp on June 30, 2017).

15.     Like every WISC client, Ms. Austin also signed certain disclosures that were presented to her. On June 7, 2017, Ms. Austin signed an InventHelp Affirmative Disclosure Statement that did not identify WISC or ISC specifically, but only referred to InventHelp, which stated that from 2014-2016 "[InventHelp] signed Submission Agreements with 7,039 clients." The disclosure said that InventHelp "charge[s] from $11,900 to $16,900 for our marketing, licensing or promotional services." *See* Exhibit 4 (Plaintiff Austin's Affirmative Disclosure Statement).

16.     On June 7, 2017, Ms. Austin signed another disclosure that did not identify WISC or ISC specifically but only referred to InventHelp, titled "Disclosures Prior To Entering Into A Contract For Invention Promotion Services." This document set forth some of the information the AIPA requires regarding the nature of InventHelp's services, and data regarding the number of customers who contracted with InventHelp in the previous five years (10,323); the number of clients "known to have received more money than they paid InventHelp" (45); and the number of InventHelp customers known to have received a license (236). *See* Exhibit 5 (Ms. Austin's "Disclosures Prior To Entering Into A Contract For Invention Promotion Services").

17.     Ms. Austin also initialed certain California-specific disclosures. One of these indicated that the total number of clients that had entered into contracts with WISC (excluding the immediately preceding thirty days) was 63,859. *See* Exhibit 6 (Ms. Austin's California Disclosures).

18.     Ms. Austin invented a product called "No More Tissue." It is a toilet seat cover, made out of cloth that could be attached to the toilet seat with "elastic, pull strings or snaps." As Ms. Austin described, consumers would no longer have to suffer with cold toilet seats. The invention could also be made out of fabric from a favorite team or a little girl's favorite character. *See* Exhibit 7 (Ms. Austin's "Description of Invention").

**Nil Leone**

19.     Plaintiff Nil Leone, a resident of Deerfield Beach, Florida, signed a Submission Agreement with InventHelp on September 10, 2018. Angela Beauchamp signed and accepted the Leone Submission Agreement on behalf of ISC. Plaintiff Leone agreed to pay $10,900 to ISC for its invention submission and matching services and also agreed to refrain from otherwise marketing her invention. *See* Leone Submission Agreement.

20.     In accordance with InventHelp's standardized practices, Plaintiff Leone signed a contract at the same time with Intromark Incorporated, an InventHelp affiliate and contractual partner that assists inventors to market their inventions, promising to attempt to obtain a sale or licensing agreement when InventHelp's submission to industry has elicited substantial interest. *See* Exhibit 8 (Intromark Proposal dated September 10, 2018 between Ms. Leone and Intromark Incorporated and by Angela Beauchamp).

21.     Ms. Leone believes that like other customers, she signed certain disclosures as well.

22.     Ms. Leone's invention is called the "Solar Stroller." It is a redesigned stroller that cools the child to keep him or her comfortable in hot weather and includes entertainment features and storage space to keep food and milk/formula chilled. *See* Exhibit 9 (Ms. Leone's Draft New Product Submission Brochure).

23.     Invention Submission Corporation d/b/a/ InventHelp is a Pennsylvania corporation with its principal place of business at 217 9th Street, Pittsburgh, PA. It purports to provide invention submission and development services to inventors by submitting inventions to industry and providing access to legal services to inventors who want to obtain a patent for their inventions.

24.     Western Invention Submission Corporation d/b/a Western InventHelp is a Tennessee corporation with its principal place of business at 217 9th Street, Pittsburgh, PA. Invention Submission Corporation, an affiliate of WISC, performs the services under WISC's contracts with consumers. WISC is a subsidiary of Technosystems Consolidated.

25.     ISC and WISC provide identical services, follow the same standardized practices and procedures, and enter into virtually identical contracts with Class members.

26.     InventHelp has over 60 sales offices in the United States, Canada, Germany, Korea, the United Kingdom and Australia. *See* InventHelp website at https://inventhelp.com/office-locator.

27.     Intromark, Inc. is a Pennsylvania corporation with its headquarters at 217 9th Street, Pittsburgh, PA. Intromark is an affiliate of Technosystems Service Corporation. Intromark is a licensing and marketing company that works with InventHelp.

28.     Technosystems Service Corporation is a Delaware Corporation with its headquarters at 217 9th Street, Pittsburgh, PA. Technosystems Service Corporation is an affiliate of WISC and performs services for WISC clients under the terms of the WISC Submission Agreement.

## JURISDICTION AND VENUE

29.     This Court has federal question jurisdiction pursuant to the American Inventors Protection Act, 35 U.S.C. § 297.

30.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one member of the proposed class is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

31.     This Court may exercise supplemental jurisdiction over the state law claims because all the claims arise from a common nucleus of operative fact such that plaintiffs would ordinarily expect to try them in on judicial proceeding.

32.     This Court has personal jurisdiction over Defendants because their headquarters and principal places of business are in this District.

33.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events giving rise to the claims occurred in this District and because Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

34.     InventHelp promises to provide invention development services to inventors seeking licensing and marketing deals. It "assist[s] and aid[s] inventors in submitting inventions, products or ideas to industry in an attempt to obtain a good faith review and reviewing any interest which may be expressed" with the ultimate goal of securing licensing agreements for InventHelp clients. *See* Plaintiffs' Submission Agreements, Preamble.

35.     InventHelp follows a "standardized submission process" that does not vary from inventor to inventor or contract to contract. *Id*.

### A. InventHelp's Misleading Scheme

36.     InventHelp takes advantage of hopeful inventors' naivete to induce them to enter into expensive agreements with false and misleading promises and by omitting to provide material information that any reasonable consumer would consider pertinent before entering into an expensive contract for invention submission services.

37.     Before entering into these contracts, InventHelp requires inventors to sign disclosures mandated by the AIPA, and, if applicable, disclosures mandated by state law. These disclosures list the number of customers who have contracted with InventHelp for invention development services and provide statistics regarding its success rate – or lack of success.

38.     In the first step, inventors contract with InventHelp to prepare a Basic Information Package ("BIP"). The BIP contains standard information such as a brief description of the product, production and manufacturing considerations, costs, classification by Standard Industrial Codes

("SIC") codes, features and functions, benefits, target markets, and distribution channels. Inventors pay between approximately $400 and $900 for the BIP. The BIP merely paves the way for the next stage of the InventHelp scheme, the contract for invention submission services, the Submission Agreement.

39.     While the BIP is formulaic, it looks professional enough to convince inventors that they have a viable idea or product and whets their appetite for the more comprehensive services that InventHelp promises to provide if they enter into a Submission Agreement with InventHelp for invention submission and promotion services

40.     The Submission Agreements remain in effect for 24 months and during that period, InventHelp clients grant InventHelp the exclusive right to submit clients' ideas to industry. *See* Plaintiffs' Submission Agreements, Section 2.

41.     In the Submission Agreement, InventHelp promises clients both unique access to industry and the benefit of InventHelp's resources and expertise. InventHelp promises to assist and aid inventors to submit their inventions to industry and specifically promises to attempt to obtain a good faith review of customers' inventions.

42.     The services that InventHelp claims to offer include the development of a "New Product Submission Brochure," submission of this brochure to companies that InventHelp matches with the clients' inventions and follow up with interested businesses. *See* Plaintiffs Submission Agreements, Section 1.C.

43.     The New Product Submission Brochure describes the client's invention, includes product specifications and a diagram or picture of the invention, and Standard Industrial Codes ("SIC") that InventHelp selects. *Id.*

44.     InventHelp then promises to match inventors' ideas to compatible companies in its Data Bank, as well as other companies in a separate non-proprietary database (that InventHelp refers to as "database" companies (versus its "Data Bank" companies).

45.     The Data Bank is the keystone of InventHelp's services and the *raison d'etre* for purchasing InventHelp's services.

46.     InventHelp represents that its Data Bank gives it the unique ability to promote clients' inventions. InventHelp further represents that Data Bank companies want to work with InventHelp and want access to InventHelp's clients' inventions for the purpose of evaluating their marketability and for licensing opportunities. Each Data Bank company is purported by InventHelp to have registered with InventHelp, identified its areas of interest, and signed a confidentiality and non-use agreement with InventHelp. *See* Plaintiffs' Submission Agreements, Sections 1.A and B.

47.     In conjunction with the Submission Agreement, clients also contract with InventHelp affiliate Intromark Incorporated. Intromark agrees to pick up where InventHelp leaves off, stepping in to attempt to negotiate licensing and marketing agreements when an invention "generate[s] substantial interest, or where Intromark, in its discretion believes it would be useful to attempt marketing or for the purpose of trying to obtain a sale or licensing agreement." *See* Plaintiffs' Submission Agreements, Section 1.N and Exhibit 8.

48.     InventHelp touts its Data Bank as a unique resource that it works to maintain and supplement by making contact with companies and asking those companies to register and identify their areas of interest. *See* Plaintiffs' Submission Agreements, Sections 1.A, 1.B and 1.D.

49.     InventHelp also agrees to make a good faith attempt to match inventions with companies in the Data Bank most likely to be interested in a particular invention by selecting

"search terms that describe the basic features of [an inventor's] invention" and SIC codes. *See* Plaintiffs' Submission Agreements, Section 1.D.

50.     Once InventHelp "matches" a client's invention to Data Bank companies, it sends the client's New Product Submission Brochure to the companies on a list it generates and sends its clients an "Industry Submission Report" identifying the companies to which it sent the clients' New Product Submission Brochure.

51.     InventHelp also sends the client's New Product Submission Brochures to "database" companies that purportedly are maintained in a separate, generic database of companies that have not registered with InventHelp, have not agreed to review inventions that InventHelp submits to them, and have not executed confidentiality and non-use agreements with InventHelp. *See* Plaintiffs' Submission Agreements, Section 1.F.

52.     InventHelp purports to send its clients' New Product Submission Brochures to approximately 100 matching companies and promises that a majority of those companies will be Data Bank Companies. *See* Plaintiffs' Submission Agreements, Section 1.H.

53.     In reality, however, InventHelp fails to inform customers that it does not: (a) verify that it includes only *bona fide* companies in its Data Bank; (b) remove non-responsive businesses from its Data Bank; (c) remove non-operative or defunct businesses from its Data Bank; (d) remove duplicative businesses from its Data Bank; (e) assure that it properly identifies the Data Bank companies; (f) assure that it properly categorizes the Data Bank companies; or (g) follow reasonable procedures to assure that it accurately identified "specific matches to general industry category matches." *See* Plaintiffs' Submission Agreements, Section 1.D.

54.     InventHelp's specific and industry "matches" are far from accurate. Its keyword searches and SIC code searches produce matches to far-flung, unrelated industries. InventHelp

then compounds the failure of the matching system to find appropriate matches by failing to screen the lists of companies before sending clients' New Product Submission Brochures to the claimed matched businesses.

55.    InventHelp has run afoul of the law in the past for, in part, similar conduct, by representing that it has special access to industry. For example, in 1994, Invention Submission Corporation of Pittsburgh (InventHelp) agreed to pay a fine of $1.2 million to the Federal Trade Commission ("FTC"). Under the terms of the settlement, among other restrictions, "ISC would be prohibited from representing that it has specialized, valuable access to business organizations." *See* Exhibit 10 ("Firm Agrees to Pay $1.2 Million in Consumer Redress to Settle FTC Charges It Misrepresented Invention Promotion Services" ("FTC Settlement")).

56.    The FTC Settlement also prohibited ISC from misrepresenting "the value, or exposure to potential manufacturers that clients may realize by having their ideas included in the company's new product advertisements or catalogs." *Id*.

**B.  InventHelp's Misrepresentations and Omissions**

57.    Plaintiffs each executed a Submission Agreement with similar provisions. These Agreements contained material misrepresentations and omitted material facts.

58.    InventHelp misled Plaintiffs that its Data Bank was accurate, up-to-date, and that it would weed out non-operational businesses, stating in its Submission Agreements with Plaintiffs and class members that it "maintains" the Data Bank, which is untrue.

59.    The Merriam Webster Dictionary, defines the term "maintains" as "to keep in an existing state (as of repair, efficiency or validity); preserve from failure or decline. Merriam-Webster Dictionary at www.merriam-webster.com/dictionary/maintains?src=search-dict-box.

60.     InventHelp did not keep its Data Bank in a state of "repair, efficiency or validity," and in fact, matched and submitted Plaintiffs' and Class members' inventions to many companies that either did not exist, or had no meaningful or detectable business presence. In effect, InventHelp sent Plaintiffs' New Product Submission Brochures into the ether with no knowledge whether: (a) the submissions would arrive at their intended target; (b) the intended target even operated a legitimate business that would review the submission, or (c) that the intended target was an appropriate match, as represented.

61.     InventHelp's promises to match inventions to appropriate Data Bank companies is a key component of its Submission Agreements. InventHelp promised to match Plaintiffs' and Class members' inventions to related Data Bank companies by selecting "search terms that describe the basic features of your invention and attempt to match your invention with companies registered in our Data Bank. To do this we search our Data Bank for companies with stated areas of interest that match the search terms assigned to your invention. We also search with keywords and/or Standard Industrial Classification codes, which involve broad industry categories. Accordingly, the search results range from specific matches to general industry category matches." *See* Plaintiffs' Submission Agreements, Section 1.D.

62.     Plaintiffs and Class members also expected that the Data Bank companies either entered into agreements with InventHelp, or confirmed their agreements recently enough that the consumer can expect an actual review by an existing company with an active interest in reviewing inventions InventHelp submitted to them, not that some of the Data Bank companies agreed to do so at some indefinite time so far in the past, that they no longer have any interest in reviewing InventHelp submissions, or are no longer in a position to review such submissions, either because the they are inactive or non-existent.

63.     InventHelp's primary function is to submit inventions to industry, and Plaintiffs and Class members had a reasonable expectation that InventHelp would submit their inventions to operational companies in the relevant line of business.

64.     Plaintiffs and Class members also expected that InventHelp's Data Bank searches and matches would hit somewhere near the target, given its representations regarding the Data Bank, its stated relationships with the Data Bank companies, and its promise to use its experience to identify appropriate matches from its own Data Bank.

65.     Had anyone at InventHelp reviewed or verified the Company Submission Reports that InventHelp submitted to its Data Bank companies, it would have been obvious to them that the InventHelp Data Bank included companies that had no meaningful existence, and that InventHelp frequently mismatched inventions and companies.

66.     Plaintiffs' experiences demonstrate how InventHelp's Submission Agreements contained material misrepresentations and omitted material factual information as set forth herein.

**C.  InventHelp Misled Ms. Austin And Did Not Act In Good Faith**

67.     InventHelp sent Ms. Austin a letter on December 11, 2017 enclosing a report titled "Company Submission Report," dated December 4, 2017. The Company Submission Report listed twenty-five Data Bank companies to which InventHelp mailed Ms. Austin's New Product Submission Brochure. *See* Exhibit 11 (December 11, 2017 Letter to Ms. Austin and Submission to Industry Report ("Austin Submission Report 1")).

68.     InventHelp sent Ms. Austin another letter on May 11, 2018, enclosing a report titled "Company Submission Report," dated April 27, 2018. This Report also listed twenty-five Data Bank companies to whom InventHelp mailed Ms. Austin's New Product Submission Brochure. *See* Exhibit 12 (May 11, 2018 Letter to Ms. Austin and Submission to Industry Report ("Austin Submission Report 2").

69.     While each of these two reports listed 25 submissions to industry (for a total of fifty), one company, Bemis Manufacturing (WI) was listed four times, three times in the April 27, 2018 Report and once in the December 4, 2018 Report. Another company, Zenith Products Corp., appeared twice on the April 27, 2018 list. Two other companies, Top Dog Direct and Viatek Consumer Products Group, likewise appear twice on the April 27, 2018 list.

70.     The Company Submission Reports reveal that, in addition to sending Ms. Austin's invention to several companies for review more than once, InventHelp also sent her submission to companies that were no longer in business or which a reasonable person would not consider an appropriate match or even operating in the same general area of industry.

71.     For instance, Amerhandle Inc. (CA), (Austin Submission Report 2) ceased operations in 2013. It submitted a "Certificate of Surrender of Right to Transact Business" on July 1, 2014 attached hereto as Exhibit 13.

72.     Ms. Austin's Company Submission Reports also include baffling "match" results. Ms. Austin hired InventHelp to seek licensing and marketing for a **toilet seat cover** which she dubbed "No More Tissue" that would prevent people from the shock of cold toilet seats. Yet, in exchange for taking Ms. Austin's money, InventHelp matched her invention to companies that were not in a compatible industry. Had InventHelp checked or reviewed Ms. Austin's Company Submission Reports, it would have been obvious that a significant portion of the companies on the list were not in a compatible industry, therefore making the submissions worthless.

73.     InventHelp claims to have sent Ms. Austin's invention to Lynk, Inc. *See* Austin Submission Report 2. Lynk sells home organization products. https://www.lynkinc.com.

74.     Another company that InventHelp claims to have sent Ms. Austin's invention to was Somerset Warehousing Plus Inc. (NJ). It does not have an active website. It may be related to

Smartworks (NJ), another company listed on the Company Submission Reports provided to Ms. Austin. If so, it is another duplicate entry. A company named SmartWorks, located in Edison, NJ "[p]rovides project development and staff augmentation services to companies in various industries including healthcare, banking, finance, telecommunication and aviation. We also provide specialized IT training to some candidates." Ms. Austin Submission Report 2; *see also* SmartWorks website available at https://www.inc.com/profile/smartworks.

75.     Like-It/Mira USA (NY) also appears on Ms. Austin's Company Submission Report. *See* Austin Submission Report 2. Google searches for MIRA USA find a non-profit charity located in Florida that promotes the "social integration of immigrants. *See* Austin Submission Report 2; *see also* http://mirausa.nationbuilder.com/.

76.     Mishu Designs NY Inc. (NY) is also not a general industry match. It sells magnets frames, stickers, and other similar paraphernalia. *See* Austin Submission Report 2; *see also* http://mishudesigns.com/.

77.     InventHelp claims it sent Ms. Austin's Toilet Seat Cover to Upper Canada Soap (Ontario) for review. Upper Canada Soap is not a match for Ms. Austin's toilet seat cover. Rather, it sells soap and certain *toiletries,* such as manicure kits, shaving kits, makeup organizers, and mirrors. While the word "toilet" is part of "toiletries," the company was not a relevant match for Ms. Austin's invention. *See* Austin Submission Report 1.

78.     InventHelp also claims to have sent Ms. Austin's Toilet Seat Cover to Soapsox Kids (CA). *Id*. SoapSox Kids is not even a remote match. It sells washclothes in whimsical shapes that hold soap for children to use at bath time. Soapsox Kids website, available at https://soapsoxkids.com/.

79.     InventHelp also claims to have sent Ms. Austin's invention to W. Kintz Plastics Inc. (NY). *See* Austin Submission Report 2. W. Kintz Plastics, now part of Universal Plastics, is a plastic fabricator that does "custom thermoforming," "gas assist injection molding, straight injection molding and structural foam molding," and "custom blow molding" to customer specifications. *See* https://plastics.com/universal-plastics-acquires-kintz-plastics/. Ms. Austin's toilet seat cover is made of **fabric.** InventHelp, once again, submitted Ms. Austin's invention to a wildly inappropriate company.

80.     It is clear that InventHelp failed to undertake appropriate due diligence to make sure that the Data Bank was current and to ensure that it sent Ms. Austin's invention to companies that were at least in the same general industry.

81.     Had InventHelp checked the submission reports and checked the status of their agreements with the Data Bank companies at reasonable intervals, it would not have sent Ms. Austin's to these companies.

**D.  InventHelp Misled Ms. Leone And Did Not Act In Good Faith**

82.     InventHelp sent Ms. Leone a report titled "Company Submission Report," dated April 8, 2019. The Report listed seventeen Data Bank companies and eight database companies to whom it mailed her New Product Submission Brochure. *See* Exhibit 14 (April 8, 2019 Company Submission Report ("Leone Submission Report 1")).

83.     InventHelp sent Ms. Leone another report titled "Company Submission Report," dated August 6, 2019. This Report listed twenty-five Data Bank companies to whom it mailed her New Product Submission Brochure. *See* Exhibit 15 (August 6, 2019 Company Submission Report ("Leone Submission Report 2")).

84.     InventHelp appears to have also submitted Ms. Leone's New Product Submission Brochure to non-existent and defunct entities.

85.     For example, InventHelp sent Ms. Leone's New Product Submission Brochure to Dubon, LLC. (FL). *See* Exhibit 15. A Florida business entity search finds a company named Dubon, LLC. The official Florida Secretary of State report for Dubon, LLC lists Dubon as "*inactive*" and indicates it was *dissolved* in 2009: "Admin Dissolution For Annual Report" on September 25, 2009.[1]

86.     InventHelp claims to have sent Ms. Leone's submission to Mossworld Enterprises, Inc. (MI). Exhibit 15. A search of the Michigan Corporate Filing System brings up Mossworld Enterprises, Inc. It was incorporated in Michigan on July 19, 2002. Mossworld, however was **dissolved** on July 15, 2017. *See* Exhibit 16 (Michigan Department of Licensing and Regulatory Affairs Report for Mossworld Enterprises, Inc.).

87.     Ms. Leone's Company Submission Reports also include baffling match results. Ms. Leone hired InventHelp to seek licensing and marketing for a "Solar Stroller" as described above. However, InventHelp claims to have sent Ms. Leone's Solar Stroller, for example, to Funny Monkey Stickers (NY) for review. *See* Leone Submission Report 1. Funny Money Stickers' Facebook page describes its mission as, "Funny Money Stickers is an exciting new way to personalize an impersonal cash gift! Show people you care by taking some time to customize their gift."                *See*                https://www.facebook.com/pg/Funny-Money-Stickers-185579601452451/about/?ref=page_internal.

---

[1]http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityNam e&directionType=Initial&searchNameOrder=DUBON%20L040000033120&aggregateId=flal-l04000003312-ddf5a3ff-0259-4fbc-93c0-585e2314d90e&searchTerm=dubon%20llc&listNameOrder=DUBON%20L040000033120.

88.     InventHelp also claims to have sent the Solar Stroller to What Kids Want (CA), which is a company that sells and licenses toys, not strollers. *See* Leone Submission Report 1; *see also* https://www.whatkidswant.com/.

89.     InventHelp also claims that it sent Ms. Leone's Solar Stroller to Mobi Technologies, Inc. (CA). *See* Leone Submission Report 2. Mobi sells baby thermometers, blood pressure monitors, and baby monitoring cameras. *See* https://getmobi.com/collections/all-product. It does not sell strollers.

90.     InventHelp also claims it sent Ms. Leone's Solar Stroller to Michaelson Entertainment (CA). *See* Leone Submission Report 2. Michaelson Entertainment sells customizable sports memorabilia, for example, board books "designed for parents, grandparents, families and friends to share their memories, team spirit, and enthusiasm with the next generation. *See* http://www.michaelsonentertainment.com/index.html.

91.     InventHelp also claims it sent Ms. Leone's Solar Stroller to Loopy Gear (CO). *See* Leone Submission Report 2. Loopy Gear sells specialty, handmade baby gear, such as wrist loops that attach toys and teethers to a baby's wrist, bibs and similar products. *See* https://www.loopygear.com/. It does not sell strollers.

92.     As described above, InventHelp failed to undertake appropriate due diligence to make sure that its Data Bank was current or to ensure that it sent Ms. Leone's invention to companies that were at least in the same general industry as the product that it told Ms. Leone it would market.

93.     Had InventHelp checked the submission reports and checked the status of their agreements with the Data Bank companies at reasonable intervals, it would not have sent Ms. Austin's invention to these companies.

## CLASS ACTION ALLEGATIONS

94.     Plaintiffs brings this action individually and on behalf of others similarly situated as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class:

> All United States residents who, within the applicable limitations period, signed a Submission Agreement with Invention Submission Corp. d/b/a InventHelp or Western Invention Submission Corp. d/b/a Western InventHelp and made any payments to these entities for invention promotion services (the "Class").

95.     Excluded from the Class are Defendants, their affiliates, legal representatives, heirs, successors, employees, or assignees. Plaintiffs reserve the right to amend the definition of the Class at the time they file their Motion for Class Certification based upon facts learned during discovery or investigation.

96.     The members of the Class are so numerous that joinder of all members in one action is impracticable. While the precise number, names, and addresses of all Class members are unknown to Plaintiffs at this time, such information can be ascertained from Defendants' records. The Class is estimated to number in the thousands.

97.     The claims of Plaintiffs and the Class have a common origin and share a common basis. All Class members suffered from the same misconduct described herein, and they all suffered the same injury and were damaged by Defendants' violations of the AIPA and violation of the duty to act in good faith with respect to their contractual promises. Moreover, under the terms of InventHelp's standard contract, the Submission Agreement "shall be governed by and interpreted according to the laws of the Commonwealth of Pennsylvania, notwithstanding any conflict of laws principles to the contrary." *See* Plaintiffs' Submission Agreements, Section 26.

98.     Common questions of law and fact exist as to all members of the Class, including, without limitation:

a.      Whether Defendants violated the AIPA by making material fraudulent representations, or omissions of material facts;

b.      Whether Defendants breached their contracts with Plaintiffs and Class members under the laws of the Commonwealth of Pennsylvania;

c.      Whether Defendants failed to act in good faith by failing to maintain and monitor the Data Bank as set forth in the virtually identical Submission Agreements signed by each Class member;

d.      Whether Defendants misrepresented that they would submit Plaintiffs' and Class members' inventions to operational companies in the appropriate industry;

e.      Whether Defendants failed to take appropriate measures to ensure the accuracy of its Data Bank;

f.      Whether Defendants failed to take appropriate measures to verify that it submitted Plaintiffs' and Class members' inventions to active, operating companies in the relevant industry;

g.      Whether Plaintiffs and the Class were damaged by Defendants' unlawful conduct;

h.      Whether Defendants' conduct was willful or intentional;

i.      Whether Plaintiffs and the Class are entitled to rescission of their contracts;

j.      Whether Plaintiffs and the Class are entitled to restitution; and

k.      Whether the Court can enter prospective declaratory and injunctive relief.

99.    Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs and all Class members were harmed in the same way by Defendants' wrongful conduct. Every member of the Class entered into virtually identical contracts with Defendants and were subject to the same false and misleading representations and omissions.

100.    Plaintiffs and every Class member suffered the same harm and were victims of the same unlawful practices. Plaintiffs seek to hold Defendants accountable for the wrongs they have committed and to make the Class whole. Plaintiffs are committed to fairly, adequately, and vigorously representing and protecting the interests of the Class. Plaintiffs have retained counsel who are qualified and experienced in class action litigation of this kind. Neither Plaintiffs nor their counsel have any interests that might cause them to refrain from vigorously pursuing the claims in this class action. In addition, Defendants have no defenses unique to Plaintiffs.

101.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the AIPA and for breach of contract. Common questions of law and fact predominate over questions affecting only individual Class members.

102.    A class action is superior to all other alternatives for the resolution of this matter, especially given that joinder of all parties is impracticable.

103.    The damages suffered by individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of this complex litigation.

104.    It would be virtually impossible for individual Class members to obtain effective relief from Defendants' actions absent certification of a class action.

105.    Individual litigation of multiple cases would be highly inefficient, a waste of judicial and party resources and the prosecution of separate actions by individual members of the Class would create a risk of inconsistent results.

106.    Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claim is small compared to the expense and burden of individual prosecution.

107.    Plaintiffs are not aware of any difficulties that regarding the management of this litigation which would preclude its maintenance as a class action.

108.    In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

## CLAIMS FOR RELIEF

### COUNT ONE

**Violation of the American Inventor's Protection Act of 1999**
**35 U.S.C. § 297**

109.    Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

110.    The AIPA authorizes any customer who enters a contract with an invention promoter and who is found by a court to have been injured by "any material false or fraudulent statement or representation, or any omission of material fact" to bring suit against the invention promoter for actual damages, or for statutory damages "in the sum of not more than $5,000." 35 U.S.C. § 297(b)(1)(A-B).

111.    Under the AIPA, if a court finds that an invention promoter "intentionally misrepresented or omitted a material fact" for the purpose of deceiving a customer, the court "may increase damages to no more than three times the amount awarded." 35 U.S.C. § 297(b)(2).

112.    Defendants are "invention promoters" because they "offer to perform or perform[] invention promotions services" and "hold[] [themselves] out through advertising or any mass media as providing such services." 35 U.S.C. § 297(c)(3).

113.    InventHelp's Submission Agreements are "contracts" as defined by the AIPA. 35 U.S.C. § 297(c)(1).

114.    Plaintiffs and Class members are "customers" as defined by the AIPA. 35 U.S.C. § 297(c)(2).

115.    Defendants provide "invention promotion services" as defined by the AIPA. 35 U.S.C. 297(c)(4).

116.    Defendants violated the AIPA by making material misrepresentations and material omissions about the nature of its exclusive Data Bank and the services they promised to perform.

117.    These misrepresentations and omissions were material because Plaintiffs and Class members would not have contracted with InventHelp for invention promotion services had they known the true facts about the Data Bank and Defendants' failure to take reasonable steps to comply with their contractual practices.

118.    Defendants' actions were intentional and willful and made for the purpose of deceiving Plaintiffs and the Class.

119.    Defendants' misrepresentations and omissions trigger liability under the AIPA.

120.    Plaintiffs and the Class were harmed by InventHelp's material misrepresentations and omissions and failure to provide the invention promotion services as contracted for and seek

to recover from Defendants the amount of actual damages they incurred, or in the alternative, the maximum $5,000 statutory per customer authorized by the AIPA for intentional and willful misrepresentations and omissions and failure to disclose material facts.

## COUNT TWO

### Breach of Contract

121.    Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

122.    InventHelp executed virtually identical Submission Agreements with each Plaintiff and with each Class member.

123.    InventHelp breached its contracts with Plaintiffs and the Class when it did not execute its promises as set forth in their Submission Agreements.

124.    Every Pennsylvania contract includes an implied duty of good faith and fair dealing.

125.    InventHelp did not act in good faith in the execution of its contractual promises.

126.    Plaintiffs and the Class reasonably expected that InventHelp would perform its obligations under its contracts in good faith and also expected that InventHelp's representations were truthful and accurate.

127.    By failing to act in good faith and to perform its contractual obligations and misrepresenting the nature of its Data Bank and failing to take reasonable and necessary steps to ensure that it could carry out its contractual promises, InventHelp deprived Plaintiffs and the Class of the benefits of their agreements.

128.    InventHelp's failure to fulfill its contractual obligations was knowing and intentional.

129.     Plaintiffs and the Class were harmed by InventHelp's breach of contract in that they paid and agreed to pay substantial sums and seek rescission of their contracts and restitution of amounts paid to InventHelp.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment on their behalf and on behalf of the Class and as follows:

1.     An order certifying the Class, as requested herein, appointing Plaintiffs as the representative of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

2.     A declaration that Defendants are financially responsible for issuing appropriate notice to the Class;

3.     Awarding damages to Plaintiffs and the Class;

4.     Rescinding Plaintiffs' and the Class's contracts with InventHelp;

5.     Awarding Class members restitution;

6.     Awarding prospective declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to restore to Plaintiffs and Class members all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful and to change their business practices;

7.     Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

8.     Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

9.     Such other and further relief as the Court deems just and proper.

Dated: October 25, 2019                    Respectfully submitted,


                                           s/Shanon J. Carson
                                           Shanon J. Carson
                                           Peter R. Kahana
                                           Amanda R. Trask
                                           BERGER MONTAGUE PC
                                           1818 Market Street, Suite 3600
                                           Philadelphia, PA  19103
                                           Tel.: (215) 875-3000
                                           Fax: (215) 875-4604
                                           scarson@bm.net
                                           pkahana@bm.net
                                           atrask@bm.net

                                           E. Michelle Drake
                                           BERGER MONTAGUE PC
                                           43 SE Main Street, Suite 505
                                           Minneapolis, MN  55414
                                           Tel:  (612) 594-5933
                                           emdrake@bm.netni