IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ETTA CALHOUN, SHERRY PORTER and )
CYNTHIA GRAY, individually and on )
behalf of a class of all persons and entities )
similarly situated, )
 )
 Plaintiffs, )
 )
 vs. )        Civil Action No. 18-1022
 )
INVENTION SUBMISSION )
CORPORATION d/b/a INVENTHELP, )
TECHNOSYSTEMS CONSOLIDATED )
CORP., TECHNOSYSTEMS SERVICE )
CORP., WESTERN INVENTION )
SUBMISSION CORP., UNIVERSAL )
PAYMENT CORPORATION, )
INTROMARK INC., ROBERT J. SUSA, )
THOMAS FROST and THOMAS FROST, )
P.A., )
 )
 Defendants. )
 )
This Opinion Also Relates To: )
Carla Austin, et al. v. Invention Submission )
Corporation, et al., No. 2:19-cv-01396 )
and )
Geta Miclaus, et al. v. Invention Submission )
Corporation, et al., No. 2:20-cv-681 )

## **MEMORANDUM OPINION**[1]

Plaintiff Etta Calhoun commenced this class action in June 2018 in the United States

District Court for the Eastern District of Pennsylvania, bringing claims individually and on behalf

of a class of all persons and entities similarly situated. This lawsuit was transferred to this Court

and the Complaint was subsequently amended twice, including the addition of Sherry Porter and

---

[1] The parties have fully consented to jurisdiction by a United States Magistrate Judge pursuant
to 28 U.S.C. § 636(c). (Civ. A. No. 18-1022, ECF No. 62.)

Cynthia Gray as named plaintiffs. The operative pleading is the Second Amended Complaint (ECF No. 56). On August 24, 2022, the parties stipulated to the dismissal of Etta Calhoun (ECF No. 233) and Sherry Porter (ECF No. 234).

Two other related class actions were filed, one by Carla Austin and Nil Leone (Civ. A. No. 19-1396) and another by Geta Miclaus, Kevin Byrne and Vim Byrne (Civ. A. No. 20-681). All three cases were later consolidated for discovery and other pretrial purposes.

Presently before the Court is Plaintiffs' Motion for Final Approval of Class Action Settlement (ECF No. 248). Their motion has been fully briefed and a final fairness hearing was held on February 1, 2023. For the reasons discussed herein, Plaintiffs' motion will be granted.[2]

## I.   Relevant Procedural and Factual Background

### A.   <u>Initial Proceedings and Discovery</u>

Plaintiffs assert claims that primarily arise under the American Inventors Protection Act, 35 U.S.C. § 297 (AIPA), as well as additional claims under Pennsylvania law. They allege that the "InventHelp Defendants" (consisting of Invention Submission Corporation d/b/a InventHelp ("InventHelp"), Western Invention Submission Corporation d/b/a Western InventHelp ("Western InventHelp"), Technosystems Consolidated Corporation, Technosystems Service Corporation, Universal Payment Corporation, Intromark Incorporated (Intromark) and Robert J. Susa (the president of these companies)) engaged in various improper acts during the course of providing invention promotion services. In addition, the "Frost Attorney Defendants" (Thomas Frost and Thomas Frost, P.A.) are alleged to have engaged in improper conduct while serving as patent

---

[2] The parties have fully consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Civ. A. No. 18-1022, ECF No. 62.)

attorneys.[3]

Plaintiffs allege that the InventHelp Defendants failed to provide certain invention promotion services that were promised to customers, including matters related to: (a) the introductory Basic Information Package Agreement offered by certain InventHelp Defendants ("BIP Agreements"), that includes the preparation of a report that described a customer's invention and potentially applicable market opportunities, along with an optional "Preliminary Patentability Opinion" authored by the Frost Attorney Defendants; and (b) a more extensive "Submission Agreement" or "SUB Agreement" which was between either InventHelp or Western InventHelp and a customer for the purchase of invention submission services. In the SUB Agreement, InventHelp agreed to submit prescribed product information to approximately 100 companies, a majority of whom purportedly were registered in the InventHelp Defendants' proprietary "Data Bank" as having agreed to review those submissions in confidence and good faith. Plaintiffs allege that the InventHelp Defendants misrepresented material information about these services that caused customers to enter into service contracts that they otherwise would not have entered into.

Defendants' motions to dismiss in each of the three cases led to the dismissal of some claims; however, the primary AIPA counts remained. The Court entered an order on July 15, 2020 that consolidated the three class actions for "discovery and other pretrial proceedings" (ECF No. 148). Shortly thereafter, Shanon J. Carson and Peter Kahana of Berger Montague PC were appointed as Interim Lead Class Counsel (ECF No. 156). It is the Court's understanding that Interim Lead Class Counsel worked cooperatively with counsel for the other plaintiffs to coordinate discovery from Defendants and avoid duplication of effort and minimize expenses.

---

[3] The *Miclaus* case names the same defendants. The *Austin* case names only some of the same defendants and Intromark and Technosystems Service Corp were dismissed from the case when their motion to dismiss was granted. Several other defendants were originally named in the *Calhoun* action but were not named in the Second Amended Complaint.

Discovery commenced on September 22, 2020. Plaintiffs' first set of interrogatories and document requests directed to the InventHelp Defendants included extensive document requests and interrogatories to InventHelp and Western InventHelp; document requests to Technosystems Service Corp., Technosystems Consolidated Corp, Intromark, Universal Payment Corp.; and document requests and interrogatories to Robert J. Susa. Shortly thereafter, Plaintiffs served a first set of interrogatories and document requests upon the Frost Attorney Defendants. Plaintiffs subsequently served a second set of interrogatories and document requests on certain InventHelp Defendants, including Intromark, InventHelp and Western InventHelp and Universal Payment Corp. Plaintiffs also responded to the InventHelp Defendants' requests for production, making their first document production on December 30, 2020, and completing their production on April 14, 2021. The parties also engaged in extensive negotiations regarding custodians and search terms to be used by the InventHelp Defendants for producing electronically stored information ("ESI").

Multiple meet and confer conferences were held by the parties to resolve a number of discovery issues. Thereafter, Defendants commenced rolling productions of responsive documents and ultimately produced approximately 22,000 documents. The parties also negotiated the terms pursuant to which the InventHelp Data Bank and related materials would be produced, culminating in a Stipulated Order entered by the Court on May 3, 2021. (ECF No. 200.)

Plaintiffs also sought the production of confidential financial information and potential insurance policies held by the InventHelp Defendants and their regional sales entities that might provide coverage for certain claims in order to gauge Defendants' financial condition and ability to potentially pay a judgment or fund a settlement. Following motion practice regarding this issue, the Court directed InventHelp to contact its regional sales entities and request copies of all insurance policies in which InventHelp was a named insured. (ECF No. 181.) Defendants produced

available insurance documents in their possession to Plaintiffs. Interim Lead Class Counsel also issued subpoenas duces tecum to a substantial number of current and former regional sales directors to compel production of certificates of insurance issued to the InventHelp Defendants. Research was also conducted concerning potentially applicable insurance coverage. Despite these efforts, Plaintiffs ultimately determined that no insurance that might provide coverage for their claims existed.

Interim Lead Class Counsel also retained expert witnesses in support of Plaintiffs' claims, whose efforts included performing a forensic analysis of the Data Bank and sampling of the Data Bank companies, identifying of former employees knowledgeable about the Data Bank and analyzing Defendants' financial resources.

### B.  Mediation and Settlement

The parties first engaged in settlement discussions by participating in mediation sessions with the Hon. Diane Welsh (Ret.) on June 4, 2020 and July 2, 2020. These efforts were not successful. After a substantial amount of fact discovery was completed, the Court referred this matter to Magistrate Judge Lisa Pupo Lenihan solely for the purpose of engaging in settlement negotiations. Because Defendants' financial circumstances represented a key issue that needed to be thoroughly considered in this context, the parties agreed their efforts would include confirmatory discovery concerning Defendants' financial status. Following such discovery, the parties engaged in extensive conferences, discussions and negotiations with Judge Lenihan over a series of months which ultimately culminated in agreement on the terms of the proposed settlement.

According to the parties, the Settlement Agreement ("SA") (ECF No. 230 Ex. 1) now before the Court takes into account all of the facts and circumstances underlying this matter,

including Defendants' financial resources.

### C. Key Terms of the Class Action Settlement Agreement

The settlement provides economic and non-economic benefits to the Settlement Class[4] as well as processes that the InventHelp Defendants agreed to implement in order to ensure the claimed wrongful conduct does not continue. The proposed settlement includes the following terms:

- $3 million to be paid into a Gross Settlement Fund;

- $20 cash outside the Gross Settlement Fund for each customer who fully paid for their BIP Agreement that submits a Claim Form deemed timely and valid by the Settlement Administrator. A total of 29,478 fully paid BIP Agreements fall into this category;

- $20 credit outside the Gross Settlement Fund against the outstanding balance for each customer who has not fully paid for their BIP Agreement that submits a Claim Form deemed timely and valid by the Settlement Administrator. A total of 7,404 not fully paid BIP Agreements fall into this category;

- An election of an $800 credit outside the Gross Settlement Fund against the outstanding balance or $3,000 in services for each of the SUB customers who have SUB Agreements that are Not Fully Paid and Open that submit a Claim Form deemed timely and valid by the Settlement Administrator. A total of 3,411 SUB Agreements Not Fully Paid and Open fall into this category;

- Up to a $1,500 credit outside the Gross Settlement Fund against the outstanding balance for each of the SUB customers who have SUB Agreements Not Fully Paid and Closed. A

---

[4] All capitalized words or phrases that relate to the terms of the settlement are defined in the Settlement Agreement.

total of 4,487 SUB Agreements Not Fully Paid and Closed fall into this category; and

- A pro rata payment of up to $250 from the Net Settlement Fund and $3,000 in services for each of the SUB customers who have SUB Agreements that are Fully Paid and that submit a Claim Form deemed timely and valid by the Settlement Administrator. A total of 10,325 SUB Agreements Fully Paid fall into this category.

In addition, Settlement Class Members who entered into more than one contract for services are entitled to relief as to each contract, except that SUB Agreement Customers are only entitled to relief based upon their SUB Agreements,  not the earlier BIP Agreements that were subsumed by the SUB Agreements.

The Settlement Agreement also provides Settlement Class Members with assistance concerning Consumer Reporting Agencies ("CRAs") as follows:

- Within 30 days of the Effective Date and as to those Class members whose balances are fully eliminated as a result of the Class member relief, the relevant InventHelp Defendant(s) shall contact all CRAs to which it (or anyone acting on its behalf) previously has reported information regarding outstanding payments owed by such Settlement Class member to any of the InventHelp Defendants, and request permanent removal of any negative tradelines previously reported to CRAs in the name of any of the InventHelp Defendants or anyone acting on their behalf regarding such outstanding payments. A tradeline shall be considered "negative" if it indicates that any payment was missed.

- Within 90 days of the Effective Date and as to those Class Members whose balances are reduced, but not fully eliminated, as a result of the Class Member Relief, the relevant InventHelp Defendant(s) shall contact the CRAs and report the modified balance.

- If at any time following 90 days after the Effective Date for any Settlement Class

Member whose balance has been fully eliminated, or following 120 days from the Effective Date for any Settlement Class Member whose balance has been modified, any such Settlement Class Member determines that any of the CRAs have not complied with the request of the InventHelp Defendants as set forth in this paragraph, inclusive of subsections, then the Settlement Class Member may provide written notice to the InventHelp Defendants, together with copies of any credit reports for which he or she contends the credit reporting has not been properly updated, via email or U.S. mail. In that event, the relevant InventHelp Defendant will, within 30 days, make a second request in writing that the CRAs update the reporting as set forth in this paragraph. (SA ¶ 67.)

Plaintiffs also obtained changes to Defendants' policies and procedures going forward with the goal of ensuring that the alleged wrongful conduct does not continue. Specifically, the InventHelp Defendants agreed to implement the following six processes to address the practices that Plaintiffs challenged in the litigation:

1. Employ a customer care team to address complaints by Settlement Class Members on a timely basis, and retain a searchable electronic record of any and all such complaints and the InventHelp Defendants' responses;

2. Prepare and implement a written policy for the InventHelp Defendants stating that they will utilize commercially reasonable best efforts to maintain and use with maximum possible accuracy the InventHelp Defendants' Data Bank, such that: (a) the Data Bank is up to date and names, addresses, and contact information are correct and active; (b) any currently registered Data Bank company is an ongoing and active business that desires to receive the submissions; (c) the registered Data Bank companies selected to match a SUB Agreement customer's invention are companies interested in reviewing inventions and ideas that are relevant to that of the SUB

Agreement customer; and (d) the InventHelp Defendants have not submitted the same invention more than once to the same Data Bank company, provided that the InventHelp Defendants can submit an idea to multiple contacts at the same company;

3.  Implement a customer outreach program to follow up on customers' satisfaction level regarding the InventHelp Defendants' services using commercially reasonable methods for testing and analyzing customer satisfaction;

4.  Modify the content of its advertising, including television, radio, print, and online advertising, to remove from their advertising the names of companies, if any, that have not registered in its Data Bank to receive client inventions;

5.  Prepare and implement a written policy prohibiting the use of issuing temporary license agreements for the purpose of inflating the figures required by AIPA 35 U.S.C. § 297 (a)(3) and (4); and

6.  Prepare and implement a written policy for the InventHelp Defendants stating that they will issue written disclosures to customers prior to a customer entering into a SUB Agreement identifying the estimated timetable for the InventHelp Defendants (or any of them) to complete each of the services they will provide under the Agreement.

(SA ¶ 21.)

As provided in the Settlement Agreement, these policies must be implemented within thirty days of the Effective Date of the Settlement, will be paid for by the InventHelp Defendants outside of the Gross Settlement Fund, and will exist for a period of at least five years from the Effective Date. (*Id.*)

As consideration for the benefits received by Plaintiffs as part of the settlement, Defendants and their subsidiaries and affiliates (defined as the "Released Parties," SA ¶ 86) will receive a

release from all claims arising out of or related to the Litigation, as well as those which were or could have been asserted in the Litigation. (SA ¶ 87.)

### D.  **Preliminary Approval and Class Notice**

In an order dated August 24, 2022, the Court granted Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement Agreement (ECF No. 229), approved the proposed notice to the settlement class, and provisionally certified the following settlement class:

> All United States residents who purchased services from any of the InventHelp Defendants during the time period from January 1, 2014 to June 30, 2021.

(ECF No. 235 ¶ 2.)  The Court appointed Angeion Group, LLC ("Angeion") as the Settlement Administrator. Its duties include effectuating and administering the Notice Plan, distributing the Settlement Notice, and administering the claim process, the exclusion process for opt-outs and the distribution of payments and other benefits to Eligible Claimants. (SA ¶¶ 46, 71.)

After receiving, analyzing and categorizing the necessary information, Angeion effected Notice to Class Members in the manner prescribed in the Settlement Agreement and the Court's Preliminary Approval Order. Angeion provided direct mail notice to 52,763 Settlement Class Members. (Tran Decl. ¶¶ 10, 12) (ECF No. 249 Ex. 1.) Angeion also provided direct notice by email to 36,140 Class Members. (*Id.* ¶ 8.) Based upon utilization of both forms of notice, it appears that a total of 52,892 out of 53,223 unique Settlement Class Members (representing 99.38% of the total class) received notice. (*Id.* ¶ 13.)

Angeion also established a toll-free hotline to inform Class Members of their rights and options. (*Id.* ¶ 15.) As of January 9, 2023, the hotline had received 4,703 calls. (*Id.*) In addition, Angeion established a settlement website, which enabled Class Members to submit a claim online, provided general information about the Settlement Agreement, court documents, and important

dates and deadlines, and also included the Settlement Administrator's contact information. (*Id.* ¶ 14.) As of January 9, 2023, the website had received 6,293 online claim submissions. (*Id.*)

### E.  Response from Settlement Class Members

The deadline to submit claim forms and request exclusion from the Settlement or to file an objection was January 6, 2023. (Prelim. Approval Order ¶ 15; Am. Prelim. Approval Order ¶ 1) (ECF Nos. 235; 238.) The Settlement Administrator reported that as of January 9, 2023, it had received 9,556 claim forms, and only 20 opt-outs and 16 objections. (Tran Decl. ¶¶ 16-18.)

### F.  Final Fairness Hearing

Plaintiffs' Motion for Final Approval of Class Action Settlement was filed on January 11, 2023. (ECF No. 248.) In support of their motion, Plaintiffs submitted declarations from their counsel and from the Settlement Administrator.

A final fairness hearing was held on February 1, 2023, at which Plaintiffs presented argument in support of their position that the settlement is fair and reasonable. They also reported on additional op-outs and objections that were received by the Settlement Administrator after their motion was filed and forwarded to them just prior to the hearing.

On February 3, 2023, Plaintiffs filed a Supplemental Response in Further Support of Plaintiffs' Motion for Final Approval of Class Action Settlement (ECF No. 253). In addition, the Settlement Administrator filed a Supplemental Declaration Regarding Additional Objections and Opt-Outs (ECF No. 252) in which it advised of an additional 25 opt-outs and additional 10 objections. (Supp. Tran Decl. ¶¶ 7, 9.) Thus, out of a total of nearly 53,000 Settlement Class Members, 45 have exercised an opt-out right and 26 objections to the proposed settlement have been asserted. (*Id.* ¶¶ 8, 10.)

## II.    Discussion

"A court presented with a joint request for approval of a class certification and settlement must separate its analysis of the class certification from its determination that the settlement is fair." *Rossini v. PNC Fin. Servs. Grp., Inc.*, 2020 WL 3481458, at *5 (W.D. Pa. June 26, 2020) (quoting *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 410 (E.D. Pa. 2010)). To certify the proposed settlement class, the Court must ensure that the putative class satisfies "the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation, as well as the relevant 23(b) requirements[.]" *Id.* (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 778 (3d Cir. 1995)). After certification, the Court then must "review the settlement agreement to determine whether it is 'fair, reasonable, and adequate' under Fed. R. Civ. P. 23(e)(2)." *Id.*

The Court will first address whether final class certification should be granted, and then turn to the fairness of the settlement. This will be followed by a brief discussion of the objections. The reasonableness of Plaintiffs' attorneys' fees and costs, and the request for Plaintiffs' service awards is addressed in a separate opinion and order.

### A.  <u>Final Class Certification</u>

Motions to certify a class are governed by Rule 23(a) and (b) of the Federal Rules of Civil Procedure. Every class action must satisfy the requirements of Rule 23(a) as well as those of Rule 23(b)(1), (2) or (3). The Third Circuit has instructed district courts to conduct a "rigorous analysis" of the arguments and evidence presented to decide whether class certification is appropriate. *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 190-91 (3d Cir. 2020).

Here, the final certified settlement class is defined as follows:

All United States residents who purchased services from any of the InventHelp Defendants during the time period from January 1, 2014 to June 30, 2021.

Based on this definition, the settlement class consists of 53,223 individuals.

As discussed below, the settlement class satisfies the threshold Rule 23(a) requirements of "numerosity, commonality, typicality, and adequacy of representation, " *In re Gen. Motors Corp.*, 55 F.3d at 778, as well as the Rule 23(b)(3) requirements that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The settlement class also complies with the Third Circuit mandate that that a Rule 23(b)(3) class be "currently and readily ascertainable." *Marcus v. BMW of North Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).

1. Rule 23(a) prerequisites

*Numerosity*

Rule 23(a)(1) requires that a purported class be "so numerous that joinder of all members is impracticable." Fed R. Civ. P. 23(a)(1). The Third Circuit has explained that "although 'no minimum number of plaintiffs is required to maintain a suit as a class action,' a plaintiff in this circuit can generally satisfy Rule 23(a)(1)'s numerosity requirement by establishing 'that the potential number of plaintiffs exceeds 40.'" *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001)).

Here, the size of the class, which is composed of 53,223 individuals, satisfies the numerosity requirement.

*Commonality*

Rule 23(a)(2) requires Plaintiffs to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is satisfied so long as the class members "share at least one question of fact or law in common with each other.'" *Reinig v. RBS Citizens,*

*N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004)). To be sure, commonality is not met merely upon a showing that the claims of the class members "depend upon a common contention." Rather, "that common contention . . . must [also] be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

The settlement class members in these actions share multiple questions of fact and law that are capable of class-wide resolution. The claims asserted by Plaintiffs on behalf of the entire class turn on common questions of fact about the InventHelp Defendants' invention promotion services, promises made about these services and the nature of the services that were provided, or not provided. Common questions of law include: (a) whether Defendants violated the AIPA by making fraudulent representations and omissions of material facts; (b) whether Defendants breached their identical contracts with Plaintiffs and Settlement Class Members; (c) whether Defendants failed to act in good faith by failing to maintain and monitor the Data Bank as set forth in the virtually identical Submission Agreements; (d) whether Defendants misrepresented that they would submit Plaintiffs' and Class members' inventions to operational companies in the appropriate industry; and (e) whether Defendant failed to take appropriate measures to ensure the accuracy of its Data Bank.

Thus, based on the common questions of fact and law in these cases, the commonality requirement is satisfied.

<u>*Typicality*</u>

Rule 23(a)(3) asks whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement

"ensur[es] that the class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009) (citations omitted). This requirement is satisfied where there is a "strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (citation omitted).

As noted above, Plaintiffs and the Settlement Class Members share the same types of claims. The claims of the Plaintiffs and those of class members both stem from similar practices and course of conduct by the InventHelp Defendants, which includes the marketing and selling of allegedly deficient invention promotion services and the alleged breach of virtually identical contracts. Thus, the typicality requirement is satisfied.

<u>*Adequacy of Representation*</u>

Finally, Rule 23(a)(4) requires that "the representative parties fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequate representation depends on two factors: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). Both requirements are met here.

All plaintiffs retained competent counsel who are experienced in the prosecution of consumer protection class actions, deeply familiar with the legal and factual issues involved in this matter and highly qualified. (Carson Decl. I ¶¶ 2-8; Carson Decl. II ¶¶ 3-5) (ECF Nos. 230 Ex. 2; 241 Ex. 2.) Lead Class Counsel diligently prosecuted the claims at issue on behalf of Plaintiffs and

the Settlement Class. (Carson Decl. I ¶¶ 9-37; Carson Decl. II ¶ 11-30; Plitt Decl. ¶ 5) (ECF No. 241 Ex. 3.) Class counsel have demonstrated a high level of skill and competence in conducting the litigation to date and have invested thousands of hours in pursuit of the claims of the class. These efforts have included, but are not limited to, investigating the claims prior to bringing suit, preparing complaints and other pleadings, motions and briefs, successfully opposing multiple motions to dismiss and motions to strike class allegations, conducting and responding to extensive discovery, reviewing and analyzing extensive information and documents produced by Defendants and third parties, retaining and working with experts and fully exploring Defendants' financial condition. (Carson Decl. II ¶¶ 44, 51) Further, Plaintiffs' counsel engaged in a lengthy and complex arms-length negotiations with Defendants with the able assistance of Judge Lenihan which ultimately resulted in a settlement. (*Id.* ¶¶ 31-34.)

Further, Plaintiffs have demonstrated that they do not have interests that are adverse to the interests of any other Settlement Class Member. Indeed, Plaintiffs and the Settlement Class share common interests in seeking compensation for the alleged harms suffered from Defendants' conduct. By advancing their claims, Plaintiffs have also advanced the claims of other Settlement Class Members. *See Vines v. Covelli Enterprises*, 2012 WL 5992114, at *4 (W.D. Pa. Nov. 30, 2012) ("There is no discernible conflict of interest in the record or otherwise between Vines and the other class members, and given the factual and legal similarities between the claims, Vines is an adequate class representative.").

This, all of the Rule 23(a) prerequisites are met.

### 2. Rule 23(b)(3) requirements

Plaintiffs seek certification under Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Third Circuit has explained that "Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement because the former, although similar, is 'far more demanding' than the latter. *Reinig*, 912 F.3d at 127 (quoting *In re Warfarin*, 391 F.3d at 528). This element "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008)). The focus of the predominance inquiry is "on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011). "To assess whether predominance is met at the class certification stage, a district court must determine whether the essential elements of the claims brought by a putative class are 'capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Gonzalez*, 885 F.3d at 195 (quoting *In re Hydrogen Peroxide*, 552 F.3d at 311-12).

Here, as articulated above, common questions of fact and law predominate over any questions that may affect individual Settlement Class Members. Both Plaintiffs and all members of the Settlement Class purchased Defendants' invention promotion services that are the subject of this litigation. Plaintiffs and the Settlement Class have the same interest in establishing liability, and they all seek damages for the same harm. Absent the proposed settlement, they would rely on the same evidence of Defendants' violations of law and on class-wide damage models to show the fact and amount of harm. Therefore, the predominance prong of Rule 23(b)(3) is satisfied.

To determine whether the superiority requirement is satisfied, the court evaluates, "in terms of fairness and efficiency, the merits of a class action against those alternative available methods of adjudication." *In re Warfarin*, 391 F.3d at 534 (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998)). In making this evaluation, the Court considers "the class members' interests in individually controlling litigation, the extent, and nature of any litigation, the desirability, or undesirability of concentrating the litigation, and the likely difficulties in managing a class action. *In re Nat'l Football League*, 821 F.3d at 435 (citing Fed. R. Civ. P. 23(b)(3)(A)-(D)).

When "[c]onfronted with a request for settlement-only class certification," the Court need not consider the final factor—i.e., difficulties in managing a class action—because "the proposal is that there be no trial." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). As for the remaining factors, it is readily evident that this class action is superior to other available methods. It is neither economically feasible nor judicially efficient for more than 9,556 Class Members who have submitted claims, let alone the 53,223 total Class Members, to pursue individual claims against the InventHelp Defendants. A class-wide settlement will not only achieve resolution of the class members' claims without multiple lawsuits and trials, but also ensures that similarly situated members are treated uniformly.

Simply put, a class action is the superior mechanism for resolving this controversy both in terms of efficiency and fairness.

### 3.   The settlement class is ascertainable

The Third Circuit has explained that "[a]scertainability is an 'essential prerequisite,' or an *implied* requirement, of Rule 23, 'at least with respect to actions under Rule 23(b)(3).'" *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 n.5 (3d Cir. 2015) (quoting *Marcus*, 687 F.3d at 592-93). Under

this two-fold inquiry, a plaintiff must establish that: "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Id.* at 163 (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).

In these cases, the class has been defined with objective criteria. The settlement class is composed of those individuals who purchased services from the InventHelp Defendants during a specified time period. A reliable mechanism was used to determine whether putative class members fell within the class definition. The class list was identified based on InventHelp's own business records and included names, addresses, and telephone numbers. The Settlement Administrator mailed copies of the notice and claim forms approved by the Court to 52,763 settlement class members and emailed notice to 39,947 email addresses.

There is thus no question that the settlement class is "currently and readily ascertainable." *Marcus*, 687 F.3d at 593.

As such, because the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied, final class certification of the settlement class is appropriate.

**B.  Fairness of the Settlement**

Next, the Court must determine whether the Settlement Agreement is "fair, reasonable, and adequate" under Rule 23(e). Fed. R. Civ. P. 23(e)(2). "Where, as here, the parties seek simultaneous class certification and settlement approval, courts should be 'even more scrupulous than usual when they examine the fairness of the proposed settlement.'" *In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 322 (3d Cir. 2019) (quoting *In re Prudential*, 148 F.3d at 316). Such an exacting review "ensure[s] that class counsel has demonstrated sustained

advocacy throughout the course of the proceedings and has protected the interests of all class members." *Id.* at 326 (quoting *In re Prudential*, 148 F.3d at 317).

At the same time, "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors Corp.*, 55 F.3d at 784 (citations omitted). As a result, when reviewing a proposed settlement, courts in this circuit apply a presumption of fairness as long as certain conditions are satisfied. This analysis begins with a determination of whether the presumption of fairness applies, followed by an evaluation of the settlement given the relevant factors and considerations under Third Circuit precedent.[5]

---

[5] Effective December 1, 2018, Rule 23(e)(2) was amended to include the following considerations to guide a court's determination of the fairness, reasonableness, and adequacy of a settlement. It requires a determination of whether:

    (A) the class representatives and class counsel have adequately represented the class;

    (B) the proposal was negotiated at arm's length;

    (C) the relief provided for the class is adequate, taking into account:

        (i) the costs, risks, and delay of trial and appeal;

        (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

        (iv) any agreement required to be identified under Rule 23(e)(3); and

    (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Advisory Committee Notes recognize that before the addition to Rule 23(e)(2) of these explicit factors to consider, circuit courts had developed their own lists of factors to determine whether a settlement was fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2) advisory committee's notes (2018 amendments). The Advisory Committee Notes also explain: "The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.* Notwithstanding the amendment of Rule 23(e)(2), the Third Circuit continues to advise district courts to assess the fairness, reasonableness, and adequacy of a settlement applying the *Girsh* factors, the relevant *Prudential* considerations, and the *Baby Products* direct benefit consideration. *See In re Google Inc.*, 934 F.3d at 329.

1.   <u>The presumption of fairness applies</u>

The Third Circuit has instructed courts to apply "an initial presumption of fairness . . . where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *In re Warfarin*, 391 F.3d at 535 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)). All of these factors are satisfied here.

The settlement negotiations were conducted over multiple sessions at arm's length with guidance from Judge Lenihan, who is an experienced jurist and mediator. (Carson Decl. I ¶¶ 36-37.)

The parties engaged in sufficient discovery to inform their negotiations before a settlement was reached. Plaintiffs directed extensive discovery to the InventHelp Defendants and the Frost Attorney Defendants in which they explored class certification issues as well as Defendants' potential liability. The actions were not settled until Plaintiffs conducted sufficient investigation to allow them to evaluate the strengths and weaknesses of their claims and the ability of Defendants to fund a settlement.

Additionally, as discussed, Plaintiffs' counsel is highly experienced in similar class action litigation, and counsel for Defendants capably defended their interests in this case.

Finally, out of the nearly 53,000 Settlement Class Members who received notice and the 9,556 class members who have submitted claim forms, only 26 objections to the proposed settlement have been asserted.

Given these factors, the proposed settlement is entitled to a presumption of fairness.

2.   The *Girsh* factors favor approval

In *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), the Third Circuit directed district courts to consider nine factors ("*Girsh* factors") in evaluating the fairness of a class-wide settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 157 (internal quotation marks and ellipses omitted). The Court "must make findings as to each of the nine *Girsh* factors in order to approve a settlement as fair, reasonable, and adequate, as required by Rule 23(e)." *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010).

### *Complexity, expense, and likely duration of the litigation*

The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *In re Cendant*, 264 F.3d at 233. This factor promotes approval of the settlement if a case requires "complex and protracted discovery, extensive trial preparation, and difficult legal and factual issues." *Id.*

If this litigation were to continue, it is virtually certain that it will be protracted and costly. Significant complex factual and legal issues remain to be resolved. The parties would be required to complete fact and expert discovery, followed by the possibility of dispositive motions. Class certification would have to be addressed, which could include not only extensive briefing but an evidentiary hearing likely to last multiple days. Even if the Court certified a class, it is possible that the class could be decertified or modified prior to trial. The trial itself would be lengthy and subject to appeal by the non-prevailing party or parties, adding additional layers of delay and expense. It is also possible that Plaintiffs would not prevail, would obtain a less favorable outcome

or that Defendants could not pay a judgment even if achieved.

Because the proposed settlement permits the parties to avoid the significant expenditure of time and resources while providing a recovery to the settlement class, this factor supports approving the settlement. *See e.g., Jackson v. Wells Fargo Bank, N.A.*, 136 F.Supp.3d 687, 701 (W.D. Pa. 2015); *Klingensmith v. Max & Erma's Restaurant, Inc.*, 2007 WL 3118505, at *4 (W.D. Pa. Oct. 23, 2007); *Frederick v. Range Resources-Appalachia, LLC*, 2011 WL 1045665, at *4 (W.D. Pa. Mar. 17, 2011

*Reaction of the class*

The second *Girsh* factor "attempts to gauge whether members of the class support the settlement." *In re Warfarin*, 391 F.3d at 536. One metric to assess this factor is "the number of objectors . . . in light of the number of notices sent and claims filed." *Cendant*, 264 F.3d at 234. *See also Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 n.15 (3d Cir. 1993) (silence is "tacit consent" to settlement); *In re CertainTeed Corp. Roofing Shingle Products Liab. Litig.*, 269 F.R.D. 468, 485 (E.D. Pa 2010).

Notice of the proposed settlement and the manner in which to submit a claim, opt-out of the settlement or lodge an objection was timely sent by the Settlement Administrator and received by 52,763 Settlement Class Members. Of that number, 9,556 claim forms were received, which provides evidence that a significant number of class members approve and value the proposed settlement. Moreover, only 26 objections were asserted, while another 45 members opted-out of the settlement. The small number of objections as compared to the size of the class reflects substantial support for the terms of the settlement, and as such, meets the second *Girsh* factor.

*Stage of proceedings and amount of discovery completed*

Through the "lens" of the third *Girsh* factor, the stage of the proceedings and the amount of discovery competed, "courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Prudential*, 148 F.3d at 319 (quoting *In re Gen. Motors Corp.*, 55 F.3d at 813).

These class actions have been aggressively and comprehensively litigated for over four years. During that time, and as discussed in this opinion, the parties have engaged in substantial motions practice and discovery. A large volume of written discovery and documents were exchanged. In addition, Plaintiffs sought and obtained information about the financial wherewithal of the InventHelp Defendants. Plaintiffs also retained experts to review and analyze the materials and information obtained during discovery. Through these efforts, counsel has achieved significant degree of information regarding the claims and defenses asserted in order to evaluate the strengths and weaknesses of these claims. This shows that Plaintiffs' counsel had a sufficient appreciation of the relevant facts and the merits of the claims asserted. It was only after completion of these significant matters that the parties engaged in lengthy settlement discussions facilitated by Judge Lenihan, ultimately culminating in the Settlement Agreement.

Based on the nature and extent of the investigation and discovery in which Plaintiffs engaged before participating in settlement negotiations, the third *Girsh* factor is satisfied.

*Risks of establishing liability and damages*

The fourth and fifth *Girsh* factors "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." *In re Warfarin*, 391 F.3d at 537. "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been

had class counsel elected to litigate the claims rather than settle them." *In re Gen. Motors Corp.*, 55 F.3d at 814.

As Plaintiffs note in their brief in support of final approval of the settlement, despite their belief that they have a strong case against Defendants, a finding of liability, obtaining a judgment and recovering on any judgment obtained are all matters that remain uncertain. As the lengthy history of these cases demonstrates, Defendants have rigorously and capably defended the claims asserted by Plaintiffs, starting with motions to dismiss and continuing throughout discovery. There is no basis to conclude that Defendants would refrain from doing so if the cases continue. Indeed, as in any contested class action, there remain multiple hurdles to navigate in order to even advance to trial, including the completion of fact and expert discovery that further analyzes Plaintiffs' position, obtaining class certification, facing the possibility of an appeal of certification or subsequent decertification and achieving a successful outcome on any dispositive motions. Plaintiffs would then have to prevail at trial and defeat any appeal that might be taken from a favorable outcome. Moreover, given the information shared by the InventHelp Defendants regarding their financial condition, it is also unknown if a judgment could be satisfied years down the road if Plaintiffs prevail.

Given these factors, it is necessary to balance the inherent risks associated with contining to litigate these cases against the certainty and immediacy of a recovery through settlement and the benefits that the Settlement Class Members will receive. *In re Prudential*, 148 F.3d at 317. As Plaintiffs correctly note, "the complexities and uncertainties of this litigation strongly warrant granting final approval of the Settlement." *See In re PNC Financial Serv. Group*, 440 F. Supp. 2d 421, 435 (W.D. Pa. 2006) ("each area of contention presents an appreciable degree of risk in plaintiffs' ability to establish a recovery. In contrast, the proposed partial settlement removes any

uncertainty and provides the class with the immediate tangible benefit of a substantial settlement.").

On balance, the Court concludes that the proposed settlement is fair and reasonable and provides significant benefit to the Settlement Class Members while avoiding the uncertainty of continued and protracted litigation. Thus, the fifth *Girsh* factor is satisfied here.

<u>*Likelihood of obtaining and keeping class certification through trial*</u>

The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *In re Warfarin*, 391 F.3d at 537. While "the standard for certification is the same for settlement classes as for conventional classes," *In re Gen. Motors Corp*., 55 F.3d at 818, this risk remains a relevant consideration for conventional classes because "[a] district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." *In re Warfarin*, 391 F.3d at 537. By contrast,  in a settlement class, there are no such "management problems for the proposal is that there be no trial." *In re Nat'l Football League*, 821 F.3d at 440.

While this factor does not weigh as significantly in the settlement of a class action, *see In re Prudential*, 148 F.3d at 321, it is evident that obtaining and maintaining class certification poses substantially more risk than providing a remedy to class members through settlement. Even if certification of a class is achieved, continued discovery and resolution of legal issues could lead to decertification or modification of the class. *See* Fed. R. Civ. P. 23(c)(1)(C). In turn, this inevitably would result in further delay and expense, as well as an uncertain outcome. Moreover, if a class is not certified, it is uncertain that individual settlement class members possess the resources and financial ability to pursue their claims. *See Carnegie v. Household Int'l, Inc.*, 376

F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits…")

Here, there is an immediate benefit to Settlement Class Members as opposed to an uncertain result that may only be achieved through protracted and expensive litigation. Thus, this factor weighs strongly in favor of granting final approval of the settlement.

<u>*Ability to withstand a greater judgment*</u>

The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." *In re Cendant*, 264 F.3d at 240. This factor "is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement." *In re National Football League*, 821 F.3d at 440.

Comprehensive discovery was conducted regarding Defendants' financial resources. As Plaintiffs assert, if this litigation were to continue and resulted in a judgment against Defendants, it is quite possible that Defendants would lack the financial resources to pay a final judgment. Indeed, if litigation continued, Defendants would have to devote significant financial resources simply to defend their position during the remaining fact and expert discovery, class certification proceedings, all other pretrial matters, the trial itself and any appeal from the verdict. As such, even if Plaintiffs ultimately prevailed, it is possible that class members would not recover any benefit whatsoever. *See In re Chambers Development Sec. Litig.*, 912 F. Supp. 822, 839 (W.D. Pa. 1995) ("Where the ability of the defendant to take a bigger hit is in doubt, or indeed when the very life of the defendant is threatened by the continuation of the proceedings, the courts generally view this as a major factor weighing in favor of approving the settlement.").

Thus, the seventh *Girsh* factor favors approval.

*Reasonableness of the settlement*

The eighth and ninth *Girsh* factors assess "whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin*, 391 F.3d at 538. These factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Id.* This assessment requires comparing "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing" with "the amount of the proposed settlement." *In re General Motors*, 55 F.3d at 806. As noted in *In re Baby Products. Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013):

> Settlements are private contracts reflecting negotiated compromises. *Sullivan,* 667 F.3d at 312. The role of a district court is not to determine whether the settlement is the fairest possible resolution—a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly. The Court must determine whether the compromises reflected in the settlement—including those terms relating to the allocation of settlement funds—are fair, reasonable, and adequate when considered from the perspective of the class as a whole.

*Id.* at 173-74.

Each Settlement Class Member will achieve the benefits outlined in the Settlement Agreement. The Court has reviewed these benefits and has weighed them against the uncertainty and risk of continued litigation, as previously discussed. In balancing these matters, the Court finds that the proposed settlement falls well within the range of reasonableness and thus, meets the eighth and ninth *Girsh* factors. *See Zanghi v. Freightcar America, Inc.*, 2016 WL 223721, at *20 (W.D. Pa. Jan. 19, 2016) (*Girsh* factors eight and nine satisfied where settlement was reasonable in light of attendant risks of continued litigation, where plaintiffs' best possible outcome was not certain and many legal and factual questions could have prevented a full recovery); *Palamara v. King's Family Restaurants*, 2008 WL 1818453, at *4 (W.D. Pa. Apr. 22, 2008) (although settlement relief

28

"a mere fraction of the potential recovery" the settlement was reasonable in light of substantial risks of continued litigation); *Klingensmith*, 2007 WL 3118505, at *5 (settlement value must be weighed against significant costs and risks of litigation).

Thus, as all of the *Girsh* factors favor approval, the Court finds that the settlement is "fair, reasonable, and adequate" to protect the interests of all class members.

### 3.   *Prudential* Considerations

The Third Circuit has also instructed that, where relevant, the following considerations ("*Prudential* considerations") should be taken into account along with the *Girsh* factors:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential*, 148 F.3d at 323. But "[u]nlike the *Girsh* factors, each of which the district court must consider before approving a class settlement, the *Prudential* considerations are just that, prudential. They are permissive and non-exhaustive . . ." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013). A reviewing court need only address those *Prudential* considerations that are relevant to the litigation in question. *In re Prudential*, 148 F.3d at 323–24.

The first *Prudential* consideration—the maturity of the substantive issues—advocates for the settlement. The Court has already determined that the parties conducted sufficient targeted discovery, understood the substantive issues, and appreciated the risks associated with continued litigation before engaging in settlement negotiations. This compels a finding that the settlement turned on a mature record.

29

The second and third *Prudential* considerations, which focus on the existence and probable outcomes of claims by other classes or other claimants, are not relevant in this litigation except as it may relate to the objections, which are discussed below.

The fourth *Prudential* consideration examines whether class or subclass members were given the right to opt out of the settlement. That was accomplished here because the notice sent to the settlement class members advised them of their right to object or to be excluded from the settlement. This resulted in 26 objections and 45 opt-outs.

The fifth *Prudential* consideration relates to the reasonableness of attorneys' fees. Plaintiffs' counsel fees and costs were disclosed in the notices sent to the settlement class members. The reasonableness of the requested fees is analyzed separately in connection with Plaintiffs' motion for attorneys' fees, and the Court has concluded that they are reasonable.

Finally, the sixth *Prudential* consideration focuses on the procedure for processing individual claims. Here, the entire claims handling process was handled by the Settlement Administrator, who submitted a detailed declaration about the process that was employed. This process was clear and transparent. The Court finds this procedure to be fair and reasonable.

Thus, the relevant *Prudential* considerations favor approval of the settlement.

### 4. *Baby Products* Consideration

Finally, in *In re Baby Products Antitrust Litig.*, the Third Circuit articulated another consideration for evaluating a settlement: "the degree of direct benefit provided to the class. 708 F.3d 163, 174 (3d Cir. 2013). The Third Circuit explained:

> In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards.

*Id.*

Here, the Settlement Agreement establishes a $3 million fund from which class members would receive cash compensation based upon specific circumstances, as outlined in the Settlement Agreement.[6] Further, Settlement Class Members who entered into more than one contract for services are entitled to relief as to each contract., Settlement Class Members will also receive assistance with consumer reporting agencies and the InventHelp Defendants have agreed to implement enhanced processes to address the practices that Plaintiffs challenged in the litigation. As a result, the Court finds that the degree of direct benefit provided to the class members points to approving the settlement.

In summary, having considered all of the relevant factors, the Court finds that final approval of the Settlement is warranted.

     5.  <u>Objections</u>

Notice was provided to over 50,000 settlement class members. In response, a total of 9,556 claim forms were submitted. Only 26 class members objected to the proposed settlement, while another 45 elected not to participate in the settlement or be bound by its terms.

The objectors take issue with the sufficiency of the relief they would receive as a result of the settlement and have communicated their frustration with Defendants. However, the Court's role "is not to determine whether the settlement is the fairest possible resolution . . ." *In re Baby Products*, 708 F.3d at 174-75. Rather, in evaluating the terms of the settlement, the focal point of

---

[6] As discussed previously, class members will receive $20 cash outside the Gross Settlement Fund for each customer who fully paid for their BIP Agreement, $20 credit outside the Gross Settlement Fund against the outstanding balance for each customer who has not fully paid their BIP Agreement, election of an $800 credit outside the Gross Settlement Fund against the outstanding balance or services valued at not less than $3,000 for each of the SUB customers who have SUB Agreements that are not fully paid and open, up to a $1,500 credit outside the Gross Settlement Fund against the outstanding balance for each of the SUB customers who have SUB Agreements not fully paid and closed and a pro rata payment of up to $250 from the Net Settlement Fund and services valued at not less than $3,000 for each of the SUB customers who have SUB Agreements that are fully paid.

the Court's inquiry is "whether the compromises reflected in the settlement . . . are fair, reasonable, and adequate when considered from the perspective of the class as a whole." *Id.* at 175. As already explained, not only is the settlement entitled to a presumption of fairness, but it also satisfies the *Girsh* factors as well as the relevant *Prudential* and *Baby Products* considerations.

At its essence, settlement is a compromise; here, as is the case in all settlements, the settlement class members will receive certain compensation and other benefits, and in turn, will give up their right to further pursue their claims. Objections that are based upon an assumption that a settlement is fair and reasonable only if it provides a complete relief are unavailing. As noted by Defendants, in evaluating a proposed settlement, courts are "called upon here to assess a settlement proposal, not the relief that would be accorded Plaintiffs were they to win their claims following litigation. Accordingly, the court can give little weight to objectors who have asserted that they are entitled to a full refund of 100% of their alleged damages." *Mexico Money Transfer Litig.*, 164 F.Supp.2d 1002, 1028 (N.D. Ill. 2000).

Notably, and as previously discussed, the objections do not acknowledge that the proposed settlement provides damages and other relief to every settlement class member while eliminating the uncertainty, risk and cost that would be associated with continued litigation. Further, the Court has considered and notes the small number of opt-outs and objections raised regarding the terms of the settlement.

Thus, based upon its conclusion that the settlement is within a reasonable range and is fair, reasonable, and adequate when considered from the perspective of the settlement class as a whole, the Court rejects the objections to the settlement.

**III.     Conclusion**

For the reasons discussed, Plaintiffs' motion for final approval of class action settlement

(ECF No. 248) will be granted.

An order will follow.


Dated: March 8, 2023                                    BY THE COURT:

                                                        /s/ Patricia L. Dodge_____
                                                        PATRICIA L. DODGE
                                                        United States Magistrate Judge